Wonderlyn Lorraine Bell **PINCKNEY,** Plaintiff,

v.

The **UNITED STATES,** Defendant.

No. 06–803 C.

United States Court of Federal Claims.

March 28, 2008.

Wonderlyn Lorraine Bell Pinckney, Georgetown, SC, pro se.

Michael Francis Kiely, with whom were Thomas J. Marshall, Managing Counsel, Civil Practice Section, United States Postal Service, Washington, DC, and Jeffrey S. Bucholtz, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION

HEWITT, Judge.

Before the court are plaintiff's Motion for Summary Judgment (plaintiff's Motion for Summary Judgment or Pl.'s Mot. Summ. J.), plaintiff's Motion to Dismiss Defendant's Counterclaim (plaintiff's Motion to Dismiss Defendant's Counterclaim or Pl.'s Mot. to Dismiss Def.'s Countercl.), plaintiff's Proposed Findings of Uncontroverted Facts! (plaintiff's Facts or Pl.'s Facts), Defendant's Opposition to Plaintiff's Motion For Summary Judgment and Defendant's Opposition to Plaintiff's Motion to Dismiss Defendant's Counterclaim (defendant's Response or Def.'s Resp.), Defendant's Proposed Findings of Uncontroverted Fact (defendant's Facts or Def.'s Facts), Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact (defendant's Response to plaintiff's Facts or Def.'s Resp. to Pl.'s Facts), Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact (plaintiff's Response to defendant's Facts or Pl.'s Resp. to Def.'s Facts), and Plaintiff's Response to Defendant's Opposition to Plaintiff's Motion For Summary Judgment and Plaintiff's Response to Defendant's Opposition to Plaintiff's Motion to Dismiss Defendant's Counterclaim (plaintiff's Reply or Pl.'s Reply).

Pro se plaintiff Wonderlyn Lorraine Bell Pinckney filed a complaint in this court on December 29, 2006, alleging wrongful termination by the United States Postal Service (USPS). Plaintiff's Complaint (Compl.). Plaintiff claims that "Postmaster Todd Lee falsif[ied] documents, mail, and gave misleading reports to Postal officials to have [her] contract terminated." Id. Plaintiff claims that her "termination was based upon Postmaster Todd Lee['s] willful intent to destroy [her] career of 18 years of service to the United Postal Service." Id. Plaintiff "pray[s] to recover the cost of [f]uture [c]ontracts and further relief as this court may seem proper." Id. (emphasis omitted). Defendant filed Defendant's Answer and Counterclaim (defendant's Answer or Def.'s Answer) on March 20, 2007. Def.'s Answer 1. Defendant denied plaintiff's allegations, Def.'s Answer ¶¶ 1, 3–11, and counterclaimed for damages for breach of contract in the amount of $1,720.74, Def.'s Answer ¶ 32.

On November 28, 2007, after a period of discovery, plaintiff filed her Motion to Dismiss Defendant's Counterclaim on the grounds that "[d]efendant failed to disclose to the court the withholding of plaintiff's final pay" and that defendant filed its claim for damages in retaliation for her exercising her rights in a court of law. Pl.'s Mot. to Dismiss Def.'s Countercl. Also on November 28, 2007, plaintiff filed her Motion for Summary Judgment seeking judgment on the ground that the reason given by the USPS for her termination was unfounded. Pl.'s Mot. Summ. J. 1–2.

## I. Background

"In 2001, plaintiff and defendant, acting through the United States Postal Service, entered into a contract, contract no. [Highway Contract Route (HCR)] 29585 [(the 2001

contract)], under which plaintiff was to deliver mail to mailboxes, both residential and commercial, in Pawleys Island, South Carolina." Def.'s Answer ¶ 13.[1] H. Todd Lee is the postmaster at Pawleys Island, South Carolina. *Id.* at ¶ 18. The 2001 contract was a renewal of a previous contract and was for a four-year term, from July 1, 2001, through June 30, 2005. *Id.* at ¶ 14. The 2001 contract was renewed for a second time on February 17, 2005 and was to run from July 1, 2005 until March 31, 2009 (the 2005 contract). Def.'s Facts ¶ 6. The 2005 contract is contained in the Appendix to Defendant's Proposed Findings of Uncontroverted Fact (defendant's Facts Appendix or Def.'s Facts App.) at pages 84–111.

A. Events of July 2, 2005

This case concerns the events of Saturday, July 2, 2005 and plaintiff's subsequent termination. *See* Compl.; *see also* Def.'s Answer ¶¶ 18–25. Most of the details concerning these events were presented to the court through defendant's Answer and Summary Judgment filings. According to these filings, the following transpired.

While delivering mail on July 2, 2005, plaintiff called Postmaster Lee and informed him that "she was unable to deliver mail at the beach area of her delivery route due to the presence of people and cars that were impeding her access to mailboxes in that area." Def.'s Answer ¶ 18; *see* Def.'s Facts App. 154 (Declaration of H. Todd Lee, Postmaster, United States Postal Service (Lee Declaration)). Plaintiff was advised by Postmaster Lee to finish the rest of her route and attempt delivery to the beach area a second time. Def.'s Answer ¶ 19; Def.'s Facts App. 154 (Lee Declaration). Postmaster Lee

"then called Deborah Fox, the Postal Service clerk in charge of the Pawleys Island post office that day, and asked her—or Ken Kirchner, another Postal Service clerk on duty that day—to note whether Ms. Pinckney had brought any mail back to the post office that day from her route." Def.'s Facts App. 154 (Lee Declaration). Ms. Fox called Postmaster Lee and informed him that plaintiff had "returned . . with 'quite a bit' of undelivered mail." *Id.* Postmaster Lee stated that he then drove to the post office and "inventoried the undelivered mail and wrote down the addresses of each envelope." *Id.; see id.* at 155–1 (List of Addresses not delivered on July 2, 2005). Defendant alleges that there were "approximately 102 pieces of undelivered mail, including approximately 53 pieces of first-class mail." Def.'s Answer at ¶ 20; Def.'s Facts ¶ 11. According to defendant, "[t]he undelivered mail was addressed to approximately 25 locations on plaintiff's route, including many locations that were not located near the beach." Def.'s Answer ¶ 21. Defendant alleges that Postmaster Lee then personally delivered all the mail that plaintiff had failed to deliver. Def.'s Answer at ¶ 22; Def.'s Facts ¶ 12. Postmaster Lee then notified Keith Harris, the contracting officer, of the situation. Def.'s Facts ¶ 13; Def.'s Facts App. 158–62 (Declaration of Keith L. Harris, Contracting Officer, United States Postal Service (Harris Declaration)). Postmaster Lee states that he sent Keith Harris "documents pertaining to the event, including photographs and statements signed by Ms. Fox and Mr. Kirchner." Def.'s Facts App. 154 (Lee Declaration).

Defendant further states that, on July 7, 2005, the contracting officer sent plaintiff a show cause notice[2] stating that plaintiff's

---

1. Facts pertaining to the existence of the contract and the positions of postal employees that are cited to filings of only one of the parties do not, for the purposes of addressing the pending motions, appear to be in dispute.

2. The Show Cause Notice reads in full as follows: On September 10, 2004, you received a letter of warning from this office. In that letter, you were given notice that satisfactory service must be restored and maintained during the term of your contract.
   It has come to my attention that on Saturday, July 2, 2005, while on your route, you contact-

ed your Postmaster, Todd Lee, about a problem in delivering the mail in the "beach area". The Postmaster told you not to curtail mail, but that you could deviate from the line of travel. He told you that you could go back to the beach area later, but that you must deliver all mail available that day. You returned to the office with mail for approximately 25 houses for Ocean Highway (not the beach area) and went home early. This undelivered mail included 53 pieces of first class mail. You failed to follow clear and direct instructions from your Postmaster.

"failure to deliver all mail available [on July 2, 2005] and disregard for the instructions of the Postmaster constitute an event of default under clause B–69, Section a, of the contract." Def.'s Answer, Ex. 1. The show cause notice directed that no later than July 15, 2005, plaintiff "provide a written explanation of [her] actions" on July 2, 2005. *Id.* The show cause notice stated that "[plaintiff's] response may also include any information that [she] would like the Postal Service to consider in deciding whether to issue default termination on the contract." *Id.* Plaintiff responded to the Show Cause Notice on July 13, 2005. *Id.* at ¶ 24, Ex. 2. In her letter[3], plaintiff pointed out that she had received a good evaluation from Postmaster Lee on July 1, 2005. *Id.* at Ex. 2. Plaintiff alleged that when she called Postmaster Lee on July 2, 2005 to inform him that she was unable to deliver some of the mail he became hostile and she hung up the phone. *Id.* Plaintiff stated: "I NEVER, NEVER, NEVER FAIL TO DELIVER THE U.S. MAIL. I DID NOT SKIP ANY MAILBOX THAT I COULD DELIVER TO. I'VE PROVEN MY COMMITMENT TO THE U.S. POSTAL SERVICE OVER THE YEARS, WITHOUT QUESTION." *Id.*

On August 8, 2005, the contracting officer sent plaintiff a letter terminating her contract for default.[4] *Id.* at ¶ 25, Ex. 3. The

> Your failure to deliver all mail available that day and disregard for the instructions of the Postmaster constitute an event of default under clause B–69, Section a, of the contract.
> This Show Cause notice gives you the opportunity to provide a written explanation of your actions in this matter. Your response may also include any information that you would like the Postal Service to consider in deciding whether to issue default termination on the contract. Your response must be received in the Eastern Area Office no later than close of business Friday, July 15, 2005.
> If the Postal Service should decide to pursue its right of termination for default, it may procure services similar to those so terminated, and you will be liable to the Postal Service for any excess costs of replacement service.
> Questions on this matter may be addressed to Donna Moore....

Defendant's Answer and Counterclaim (defendant's Answer or Def.'s Answer) Ex. 1. 4

3. Plaintiff's Response to the Show Cause Notice reads in full as follows:

> On Friday, July 1st, 2005, Postmaster Todd Lee, called me into his office upon my arrival. He stated that it wasn't anything wrong, but he needed to do an quarterly evaluation report. He stated the following:
> I am a very good worker
> He don't get complaints on my route.
> Several other positive comments were stated July 2nd, 2005, I called Postmaster Todd Lee to report problems in my attempt to deliver the mail. He instructed me to deviate from the line of travel, he also stated the following:
> I'm paranoid
> I'm not fit to deliver the mail
> I should just resign
> He began to shout abusive language & he became very hostile
> I abruptly hung up the phone.
> These are ill-considered false statements by Postmaster Todd Lee—I have been unjustly accused, wrongly treated by the Postmaster.

> These are very harsh unacceptable words spoken by Postmaster Todd Lee.
> I NEVER, NEVER, NEVER FAIL TO DELIVER THE U.S. MAIL. I DID NOT SKIP ANY MAILBOX THAT I COULD DELIVER TO. I'VE PROVEN MY COMMITMENT TO THE U.S. POSTAL SERVICE OVER THE YEARS, WITHOUT QUESTION.
> The only instance that would warrant the mail not being delivered is the following:
> MAIL BOX BLOCKED
> STREET/ROAD UNACCESSIBLE DUE TO CONSTRUCTION
> MAIL BOX IS DOWN
> I SOLEMNLY REPEAT, I DON'T PLAY GAMES WITH THE MAIL. I TAKE PRIDE IN MY WORK. I LOVE DELIVERING THE U.S. MAIL.
> These false accusation by Postmaster Todd Lee is to besmirch my character, ruin my career with the U.S. Postal Service. Please consider the facts, one day he's praising me for my good works, the next day he's speaking words of anger. This is an emotional Postmaster who needs to enroll in ANGER MANAGEMENT.

Def.'s Answer Ex. 2.

4. The Termination for Default letter reads in full as follows:

> Enclosed is a copy of Form 7440 terminating your right to perform service on Highway Contract Route 29585 Pauleys Island Box Delivery, as of the close of business August 9, 2005.
> On July 2, 2005, despite the explicit instructions of the Administrative Official you did not deliver all deliverable mail. On July 7, 2005, you were issued a Show Cause Notice from this office that extended to you an opportunity to explain your actions of Saturday July 2, 2005. Your response to that notice was received on July 13, 2005 and did not adequately address the issue of non-delivered deliverable mail.
> Consequently, your right to perform service on this route is terminated under Section H.4.,

termination letter stated that plaintiff did not deliver all deliverable mail on July 2, 2005 and that plaintiff "did not adequately address the issue of non-delivered deliverable mail" in her response to the show-cause notice. *Id.* at Ex. 3. The termination letter also informed plaintiff of the Postal Service's right to seek damages from plaintiff. *Id.* According to defendant, "[p]laintiff's failure to perform service according to the terms of the contract and her failure to offer an explanation of her non-performance constituted a breach of the contract." *Id.* at ¶ 26. The USPS entered into an emergency replacement contract for mail delivery following plaintiff's termination, allegedly causing it to suffer damages in the alleged amount of $1,720.74. *Id.* at ¶ 27–30.

### B. Relevant Contract Terms

The dispute appears to implicate the following sections of the 2005 contract: Section B. Statement of Work and Specifications, Def.'s Facts App. 88; Highway Contract Route (HCR) Terms and Conditions, *id.* at 112; and Clause B–69 Events of Default, United States Postal Service Interim Internal Purchasing Guidelines (May 19, 2005), *id.* at 157. Under section B.1.4 of the 2005 contract plaintiff was "required to perform box delivery services to the customers and all other related services as outlined in Section B.3" of the 2005 contract. *Id.* at 91. Section B.3.a of the 2005 contract states that "[t]he supplier shall carry all mail tendered for

transportation under this contract, whatever may be its size and weight, with certainty, celerity, and security, in accordance with the operating schedule." Def.'s Facts App. 92. Furthermore, under section B.3.j, "If Section B or another part of this contract calls for 'box delivery' or similar services, the supplier shall, when so directed by the contracting officer, perform any or all of the following: (1) The supplier may be required to provide the following services under this contract: (a) Deposit all mail matter received for that purpose from a post office into the appropriate customer mail boxes...." *Id.* at 94–95.

Both the 2001 and the 2005 contracts were Highway Contract Route (HCR) contracts. *See* Def.'s Facts App. 16 (Renewal of Transportation Services Contract), 88–102 (Contract Statement of Work and Specifications), 103–05 (Contract Schedule Information). The terms and conditions for an HCR contract are included in defendant's Facts Appendix. *Id.* at 112–52 ("Highway Contract Route (HCR) Terms and Conditions"). The HCR terms and conditions "apply to all solicitations and contracts." *Id.* at 113 (Preface to HCR Terms and Conditions). Among the general clauses included in HCR solicitations and contracts is the following clause contained at section 2.3.1, which contemplates terminations for default, and, in case the USPS improperly terminates for default, the conversion of the termination for default into a termination for convenience:

Termination For Default (Clause B–71) of the Request For Proposal Transportation Contract General Clauses, for failure to perform service according to the terms of the contract.

This action does not relieve you of the obligations you assumed when you renewed the contract effective 1, 2005. Section H.6. (Clause B64) of the Request For Proposal Transportation Contract General Clauses, allows the Postal Service the right to seek damages equal to the actual excess costs incurred for the performance of this service through the remainder of the contract term. You will be notified in a subsequent letter of the exact amount of damages you owe.

This is the final decision of the Contracting [O]fficer. Under the Contract Disputes Act of 1978 and the clause of your contract entitled Claims and Disputes, you may appeal this decision to the Postal Service Board of Contract Appeals. If you decide to make an appeal to the Board of Contract Appeals, you must pro-

vide written notice (preferably in triplicate) to the Contracting [O]fficer within 90 days from the date you receive this decision. The notice should identify the contract by number, reference this decision, and indicate that you intend to appeal. In taking an appeal to the Board of Contract Appeals, you may include in your notice of appeal an election to proceed under the Board's Accelerated procedure, which provides for a decision within approximately 180 days. If you do not make an election in the notice of appeal, you may do so by written notice anytime thereafter.

In lieu of appealing this decision to the Board of Contract Appeals, you may bring an action directly on the claim in the United States Court of Federal Claims. You must file this action within twelve months of the date you receive this decision.

Questions on this matter may be addressed to Doug Veatch of my staff....

Def.'s Answer Ex. 3 (emphasis omitted).

m. *Termination for Default. The Postal Service may terminate this contract, or any part hereof, for default by the supplier*, or if the supplier fails to provide the Postal Service, upon request, with adequate assurances of future performance. In the event of termination for default, the Postal Service will not be liable to the supplier for any amount for supplies or services not accepted, and the supplier will be liable to the Postal Service for any and all rights and remedies provided by law. The debarment, suspension, or ineligibility of the supplier, its partners, officers, or principal owners under the Postal Service's procedures (*see* United States Postal Service Purchasing Manual *3.7*) may constitute an act of default under this contract, and such act will not be subject to notice and cure pursuant to any termination of default provision of this contract. *If it is determined that the Postal Service improperly terminated this contract for default, such termination will be deemed a termination for convenience.*

*Id.* at 127 (emphasis added).

At section 2.3.1(s)(8) the HCR contract incorporated by reference clause B–69 of the Postal Service's Purchasing Manual. Def.'s Facts App. 128; Def.'s Answer ¶ 15. Clause B–69 specifies certain events of default which may give rise to termination. These events include the default alleged here, "failure to perform services:"

5. The parties' Joint Preliminary Status Report (JPSR) sets forth the relevant factual and legal issues as follows:

For the plaintiff:
(1) The defendant willfully intended to maliciously alter statements given in defendant's answer stated on page 3, lines 20, 21, and 22, which do not coincide with statements admitted in Exhibit 1, paragraph 2, given the fact that Postmaster Todd Lee was very specific in the allegations he stated resulted in plaintiff's contract termination.
(2) The Postal Service sought reprocurement costs twenty (20) months later, after learning that plaintiff had exercised her rights against the Postal Service in court.
(3) The Postal Service failed to show or state the monies that had been withheld to offset the erroneous counterclaim alleged.
(4) The Postmaster never came to the Post Office to deliver mail, as stated in defendant's answer on page 3, line 22, because there was no mail to deliver.

The supplier's right to perform this contract is subject to termination under the clause entitled Termination for Default. The following constitute events of default, and this contract may be terminated pursuant to that Clause.

a. The supplier's failure to perform service according to the terms of the contract[.]

Def.'s Facts App. 157 (Clause B–69 Events of Default, United States Postal Service Interim Internal Purchasing Guidelines (May 19, 2005)); Def.'s Answer ¶ 16; Def.'s Facts ¶ 8.

C. Issues in Dispute

The parties filed a Joint Preliminary Status Report (JPSR) on August 22, 2007. JPSR 1. According to the JPSR, "[b]oth parties anticipate[d] that, after the conclusion of discovery, they [would] respectively file motions for summary judgment pursuant to RCFC 56." *Id.* at 2. The JPSR sets forth the relevant factual and legal issues from the perspectives of each party, including, for the plaintiff, whether Postmaster Lee came to the Post Office to deliver mail on July 2, 2005 and whether he willfully intended to have plaintiff fired, and for defendant, whether the termination for default was justified and whether the reprocurement costs were reasonable. *Id.* at 2–3.[5] On November 28, 2007 plaintiff filed plaintiff's Motion for Summary Judgment[6], along with six depositions, and

(5) Evidence will show that the Postmaster swore in the presence of plaintiff's co-workers that he would have her fired.
(6) The above facts reveal a reasonable image of vindictiveness on behalf of Postmaster Todd Lee of the Postal Service.
For the defendant: The relevant issues in this case are (1) whether the default termination was justified, based upon a preponderance of the evidence, and (2) if the termination for default was justified, whether the assessed reprocurement costs are reasonable, *i.e.*, (i) whether the reprocured services are the same as or similar to those involved in the termination; (ii) whether the government actually incurred excess costs; and (iii) whether the government acted reasonably to minimize the excess costs resulting from the default.
JPSR 2–3 (citations omitted).

6. Plaintiff attached to her Motion for Summary Judgment her notes, dated May 27, 2004, from a conversation with Judge Barry McCall, a South

plaintiff's Motion to Dismiss Defendant's Counterclaim. Pl.'s Mot. Summ. J; Pl.'s Mot. to Dismiss Def.'s Countercl.

Plaintiff filed plaintiff's Facts on December 10, 2007. Pl.'s Facts. Plaintiff filed her Motion For Leave of Court to Amend to Correct Numerical Errors on Filing Dated: December 4th, 2007 of Proposed Findings of Uncontroverted Facts! on January 17, 2008. The court granted plaintiff's motion to amend on January 18, 2008. Order of Jan. 18, 2008. Plaintiff's Facts call into question whether Postmaster Lee delivered the mail that plaintiff allegedly failed to deliver to approximately twenty-five locations. Pl.'s Facts ¶¶ 4–5.

Defendant filed its response to plaintiff's Motion for Summary Judgment and plaintiff's Motion to Dismiss Defendant's Counterclaim on January 18, 2008. Def.'s Resp. Importantly, defendant explains why it did not file a cross-motion for summary judgment and states that it does not believe summary judgment is appropriate because there is a disputed issue of material fact:

> After due consideration of the issues and the evidence, defendant has chosen not to file a cross-motion for summary judgment because it appears to defendant that there is a genuine issue of material fact in this case. The plaintiff, in her deposition testimony, adamantly asserted that she had not failed to deliver mail on July 2, 2005. The Postal Services's allegation that plaintiff, in fact, failed to deliver mail on July 2, 2005, was the triggering event for the default termination of her contract. Given this stark dispute regarding arguably the most material fact in this case, defendant believes that this case is not amendable to resolution by summary judgment.

Def.'s Resp. 1 n. 1 (citation omitted). As more particularly explained below, the court agrees with defendant's conclusion that the case cannot be resolved on summary judgment.

Defendant filed its Response to Plaintiff's Facts and defendant's Facts on January 18, 2008. Def.'s Resp. to Pl.'s Facts; Def.'s Facts. Plaintiff filed plaintiff's Response to defendant's Facts on February 4, 2008. Pl.'s Resp. to Def.'s Facts. Plaintiff filed her reply to defendant's Response on February 15, 2008. Pl.'s Reply 1. According to plaintiff, the triggering event for her default termination was not her failure to deliver mail, because there was no undelivered mail to deliver. Pl.'s Reply 6. Instead, plaintiff asserts that the triggering event was "the tub of mail removed from [plaintiff's] workstation by Deborah Fox." *Id.* (capitals in original). According to plaintiff, the mail in the tub was all mail that was on hold. *Id.* "There is no stark dispute regarding the most material fact in this case," plaintiff asserts, because "we know that Postmaster Todd Lee did not go out on that mail route July 2, 2005." *Id.*

## II. Plaintiff's Motion for Summary Judgment

### A. Legal Standards

The grounds for summary judgment are set forth in Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). RCFC 56. RCFC 56(c) provides:

> [Summary] judgment ... shall be rendered ... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

RCFC 56(c); *see Mann v. United States,* 334 F.3d 1048, 1050 (Fed.Cir.2003) ("Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." (citing RCFC 56(c))). The moving party has the initial burden of demonstrating

---

Carolina Magistrate Judge located in Pawleys Island, SC, regarding people who interfered with her ability to deliver mail and the failure of police to respond adequately, plaintiff's Motion for Summary Judgment (Pl.'s Mot. Summ. J.) 5–6, her notes regarding a meeting with Postmaster Keith Roy on June 21, 2004 during which she discussed her problems with delivering the mail,

*id.* at 7–8, and a postal form stating: "The approach to your box should be kept clear of snow, vehicles, and other obstacles," *id.* at 9. These attachments are not documents of a type on which the court may rely in deciding a motion for summary judgment. *See* Rules of the United States Court of Federal Claims (RCFC) 56(c); *see also infra* Part II.

"the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett (Celotex )*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[7] This burden may be discharged by "pointing out ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's clam." *Id.* at 323, 106 S.Ct. 2548 (emphasis omitted).

RCFC 56(e) provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

RCFC 56(e). When considering a motion for summary judgment, the court will draw all underlying factual inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp. (Matsushita)*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Mann*, 334 F.3d at 1050 (citing *Anderson v. Liberty Lobby, Inc. (Anderson)*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–

48, 106 S.Ct. 2505. A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. 2505. An issue is genuine if it "may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505; *see Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (stating that there is no genuine issue "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

B. Discussion

Plaintiff seeks summary judgment that the reason given by the USPS for her termination was unfounded. Pl.'s Mot. Summ. J. 1–2. In order to prevail on her motion plaintiff must demonstrate "the absence of a genuine issue of material fact," *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548, in particular that "there is an absence of evidence to support [defendant's] case" that plaintiff's termination for default was justified, *see id.* at 325, 106 S.Ct. 2548. The question of whether plaintiff's termination for default was justified turns on whether plaintiff "fail[ed] to perform service according to the terms of the contract." *See* Def.'s Facts ¶ 8 (Clause B–69). Therefore, whether plaintiff delivered all deliverable mail on July 2, 2005 is a material fact. In order to prevail, plaintiff must demonstrate that there is no "genuine issue" as to whether she "[d]eposit[ed] all mail ... into the appropriate customer mail boxes." Def.'s Facts App. 95. In its determination of whether plaintiff has carried its burden under the RCFC, the court must draw all factual inferences in favor of defendant as the non-moving party. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. For the following reasons, the court concludes that

---

7. The RCFC generally mirror the Federal Rules of Civil Procedure (FRCP). RCFC 56 Rules Committee Notes ("The subdivision structure of RCFC 56 was reordered to more closely conform to FRCP 56."); *see United Keetoowah Band of*

*Cherokee Indians of Okla. v. United States*, 480 F.3d 1318, 1324 n. 2 (Fed.Cir.2007) (stating that RCFC 19 is "virtually identical" to FRCP 19). Therefore, this court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

plaintiff has not met her burden under RCFC 56 to move for summary judgment.

Plaintiff argues that Postmaster Todd Lee did not deliver mail to her route on July 2, 2005 because there was no undelivered mail to deliver. Pl.'s Reply 6. In her deposition, plaintiff "dispute[s] that there was undelivered mail for those 25 locations regardless of where they were located." Def.'s Facts App. 173 (Excerpts from the Deposition of Wonderlyn Lorraine Bell Pinckney).[8] According to statements contained in plaintiff's briefing (but not contained in the portions of her deposition testimony filed with the court) at some time around the week of July 9, 2005, Postmaster Lee asked three clerks to "witness and sign statements verifying his allegation of mail that was not delivered," but they refused. Plaintiff's Response to Defendant's Answer (plaintiff's Response or Pl.'s Resp.). The deposition testimony of two other deponents, however, indicates that multiple pieces of mail were brought back by plaintiff to the post office undelivered on July 2, 2005. Deposition of Deborah Fox 3:23–4:17 ("Postmaster Todd Lee called and asked me to put any mail that Wonderlyn Pinckney brought back from her route on his desk.... Then at 2:30 p.m. the Postmaster Todd Lee asked Ken Kirchner and myself to witness the mail that she had not delivered that day. There was ... approximately 100 pieces of 25 individual addresses"); Deposition of Kenneth Kirchner 4:9–14; Ex. 1 to Deposition of Kenneth Kirchner ("On July 2, 2005 I was asked to come to the conference room to view some mail that was brought back by the HCR Carrier of route 3. The conference table was full of mail. Some piles were bigger than others.").[9]

Plaintiff also "dispute[s] that Mr. Lee used his own vehicle to deliver the mail that was not delivered to [her] route." Def.'s Facts App. 176 (Excerpt from the Deposition of Wonderlyn Lorraine Bell Pinckney). As support for this contention, plaintiff argues that "Deborah Fox stated that far as she and Ken K[i]rchner knew, Postmaster Todd Lee did not go out on the route." Pl.'s Resp. to Def.'s Facts ¶ 12. However, Deborah Fox never states this in her deposition. See Deposition of Deborah Fox passim. Nor do the portions of plaintiff's deposition before the court address this subject. See Def.'s Facts App. 172–76 (Excerpts from the Deposition of Wonderlyn Lorraine Bell Pinckney). In response to statements that Postmaster Lee delivered the undelivered mail on July 2, 2005, plaintiff stated in briefing (but not in deposition testimony) that "postal clerks have stated that approximately a week after these serious allegations, Postmaster Todd Lee called them into the meeting room displaying on the boardroom table piles of mail that was undelivered on July 2nd, 2005." Pl.'s Resp. According to the depositions of clerks Deborah Fox and Kenneth Kirchner, however, they were called into the conference room on July 2, 2005 to witness the undelivered mail. Deposition of Deborah Fox 3:23–4:6 ("On July the 2nd, 2005 at approximately 1:45 p.m., Postmaster Todd Lee called and asked me to put any mail that Wonderlyn Pinckney brought back from her route on his desk.... Then at 2:30 p.m. the Postmaster Todd Kee asked Ken Kirchner and myself to witness the mail that she had

8. The court has before it only excerpts from plaintiff's deposition provided by defendant. *See* Appendix to Defendant's Proposed Findings of Uncontroverted Fact (Def.'s Facts App.) 172–76 (Excerpts from the Deposition of Wonderlyn Lorraine Bell Pinckney). The excerpts from plaintiff's deposition do not contain all of the arguments set forth in plaintiff's briefing. *Compare* Def.'s Facts App. 172–76 (Excerpts from the Deposition of Wonderlyn Lorraine Bell Pinckney) (disputing that there was undelivered mail, disputing that Postmaster Lee delivered any undelivered mail that plaintiff brought back to the post office, and stating that Postmaster Lee had never sorted plaintiff's mail prior to July 2, 2005), *with* Plaintiff's Response to Defendant's Answer (Pl.'s Resp.) (alleging that Postmaster

Lee had clerks observe the undelivered mail from July 2, 2005 a week later and alleging that three clerks refused to verify Postmaster Lee's allegations of undelivered mail), *and* Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact (Pl.'s Resp. to Def.'s Facts) ¶ 12 (alleging that Deborah Fox and Ken Kirchner knew Postmaster Lee did not deliver plaintiff's mail on July 2, 2005).

9. The court understands that plaintiff was the HCR carrier for route 3. Deposition of Kendrick Bryant 3:14–19 (stating, in response to plaintiff's question, that he took over route 3 after plaintiff was terminated); Deposition of Deborah Fox 4:24–25.

not delivered that day."); Ex. 1 to Deposition of Deborah Fox; Deposition of Kenneth Kirchner 4:9–12 ("On July 2nd, 2005 I was asked to come to the conference room to view some mail that was brought back by the HCR Carrier of Route 3."); Ex. 1 to Deposition of Kenneth Kirchner. Furthermore, defendant has provided the court with the declaration of Postmaster Todd Lee in which Postmaster Lee states that when he arrived at the post office on July 2, 2005 "[t]here were 102 pieces of mail, including 53 pieces of first class mail, that had been mailed to 25 different addresses on Ms. Pinckney's route." Def.'s Facts App. 154 (Lee Declaration). Postmaster Lee states that he "document[ed] the addresses of the undelivered mail from Ms. Pinckney's route, [and] ... loaded the mail into [his] personal vehicle and delivered the mail [himself]." *Id.*

"[B]ased upon the materials sent to [him] by Mr. Lee, which included photographs of undelivered mail, employee's statements regarding the undelivered mail, and Mr. Lee's own memo summariz[ing] the events, [Keith Harris] concluded that in fact Ms. Pinckney had failed to deliver a substantial amount of mail on July 2, 2005." Def.'s Facts App. 163 (Harris Declaration). Plaintiff's assertion that there was no undelivered mail to deliver is directly contradicted by deposition testimony elicited by plaintiff, Deposition of Deborah Fox 4:3–23; Deposition of Kenneth Kirchner 4:9–14; Ex. 1 to Deposition of Kenneth Kirchner, and plaintiff's assertion that Todd Lee did not deliver mail to plaintiff's route on July 2, 2005 is simply not supported in the deposition testimony, *see* Deposition of Deborah Fox *passim;* Deposition of Kenneth Kirchner *passim;* Def.'s Facts App. 154 (Lee Declaration). Plaintiff questions whether the alleged piles of undelivered mail were in fact

photographed. *See* Pl.'s Reply 3, 6 ("[T]he defendant[s] would not have made so many mistakes in their story if they had photographs of the mail with the addresses [they allege] to have been non delivered on July 2, 2005."). However, regardless of the existence of photographs of the undelivered mail, considering the declarations of Postmaster Lee and the depositions of Deborah Fox and Kenneth Kirchner, all of which testify to the existence of non-delivered mail and all of which conflict with plaintiff's argument and deposition testimony "disput[ing] that there was undelivered mail [on July 2, 2005]," Def.'s Facts App. 173 (Excerpts from the Deposition of Wonderlyn Lorraine Bell Pinckney), there is a genuine issue of material fact regarding whether plaintiff returned to the post office on July 2, 2005 with undelivered mail.

Plaintiff alleges that defendant "wilfully intended to maliciously alter statements," JPSR 2, and "that Postmaster Todd Lee filed these fraudulent charges to have [her] contract terminated," Pl.'s Resp. Postmaster Todd Lee stated that he compiled a list of addresses where mail was not delivered on July 2, 2005 and notified the contracting officer of the situation. Def.'s Facts App. 154 (Lee Declaration); *see id.* at 155–1; *see also* Deposition of Kendrick Bryant *passim;* Ex. 1 to Deposition of Kendrick Bryant. According to plaintiff, the list of addresses where mail was not delivered on July 2, 2005 that was provided by defendant, Deposition of Kendrick Bryant *passim;* Ex. 1 to Deposition of Kendrick Bryant, contradicts the letter which resulted in plaintiff's termination, Pl.'s Mot. Summ. J. 2. The court understands plaintiff to argue that the discrepancies between these two items demonstrate the falsity of Postmaster Lee's allegations.[10] *See*

10. Plaintiff's show cause notice states:

You returned to the office with mail for approximately 25 houses for Ocean Highway (not the beach area) and went home early. This undelivered mail included 53 pieces of first class mail. You failed to follow clear and direct instructions from your Postmaster.

Def.'s Answer Ex. 1. Plaintiff asserts that of the "25 houses for Ocean Highway (not the beach area)" that defendant alleges did not receive mail on July 2, 2005, only seven to nine actually receive mail. Pl.'s Mot. Summ. J. 3; Plaintiff's

Proposed Findings of Uncontroverted Facts! (Pl.'s Facts) ¶ 7 (stating that there are "only 7 to 9 residential deliveries on Ocean Highway"). Kendrick Bryant, the mail carrier who took over plaintiff's route after her termination, stated that there are somewhere between seven and nine residential boxes on Ocean Highway. Deposition of Kendrick Bryant 3:20–25. Doug Fox, a maintenance employee at Pawleys Island Post Office, Deposition of Doug Fox 3:12–13, stated that he does not think there are twenty-five houses on Ocean Highway. Deposition of

Pl.'s Mot. Summ. J. 2–4; Pl.'s Facts ¶¶ 7, 9; Pl.'s Reply 3–6. Plaintiff's argument regarding the discrepancies between defendant's list of addresses and the show cause notice, however, does not negate other evidence that plaintiff returned to the post office with undelivered mail on July 2, 2005.

According to defendant, the show cause notice sent to plaintiff on July 7, 2005 "mistakenly stated that Ms. Pinckney 'returned to the office with mail for approximately 25 houses for Ocean Highway (not the beach area),' instead of saying that Ms. Pinckney 'returned to the office with mail for approximately 25 houses, some of which were for Ocean Highway (not the beach area).'" Def.'s Facts ¶ 14; Def.'s Facts App. 162 (Harris Declaration). Regarding the discrepancies surrounding the list of addresses, the Contracting Officer stated:

> The addresses of the mailboxes whose mail was not delivered by Ms. Pinckney on July 2, 2005, were largely an immaterial fact in my decision to terminate Ms. Pinckney's contract for default since her response to the "Show Cause Notice" was a total denial of any wrongdoing and she did not claim that mail for any specific address could not be physically delivered.... Moreover, even if some of the addresses where Ms. Pinckney failed to deliver mail on July 2, 2005 were in the beach area and not on Ocean Highway, that would not have altered my decision to terminate, since a significant percentage of the undelivered

mail was indisputably on Ocean Highway and in other areas away from the beach area.

Def.'s Facts App. 163–64 (Harris Declaration). As defendant states: "The fact that the [Show Cause Notice] incorrectly stated 25 addresses were not in the beach area, when nine addresses were in that area, did not vitiate the [Show Cause Notice] and did not deny Ms. Pinckney an adequate opportunity to respond to the allegations." Def.'s Resp. 12–13. According to defendant, a "Show Cause Notice" was not required under the terms of the contract given the nature of plaintiff's default. *Id.* at 10. Furthermore, defendant argues that if the court "find[s] that Ms. Pinckney was entitled to a cure notice or show-cause notice, the Postal Service's 'Show Cause Notice' of July 7, 2005, was perfectly acceptable because the plaintiff was adequately and timely notified of the problems with her contract performance and was given an opportunity to explain them." *Id.* at 11.

Plaintiff appears to argue—in effect in the alternative to her position in her deposition that she did not return to the post office with undelivered mail and that "[t]he only mail at [her] desk in a flat tub was HOLD MAIL," Pl.'s Mot. Summ. J. 4,—that any undelivered mail that she brought back to the Post Office on July 2, 2005 could not be delivered because the mailboxes were blocked, Pl.'s Reply 5.[11] Plaintiff maintains that she "did not

---

Doug Fox 5:7–11. Plaintiff asserts that the seven to nine residential mailboxes on Ocean Highway "didn't get (102) pieces of mail in (1) week, let alone (1) day." Plaintiff's Response to Defendant's Opposition to Plaintiff's Motion For Summary Judgment and Plaintiff's Response to Defendant's Opposition to Plaintiff's Motion to Dismiss Defendant's Counterclaim (plaintiff's Reply or Pl.'s Reply) 2. Furthermore, the list of addresses where mail was not delivered on July 2, 2005 only contains twenty-two addresses. Pl.'s Mot. Summ. J. 3; Deposition of Kendrick Bryant *passim;* Ex. 1 to Deposition of Kendrick Bryant. Additionally, plaintiff asserts that three of the addresses on the list of undelivered addresses did not have a mailbox on July 2, 2005, Pl.'s Reply 4, and because "10744–B Ocean Highway does not have a mail recept[acle]" it could not be true that Postmaster Lee delivered mail to that address as he claims, Pl.'s Reply 3. Finally, plaintiff alleges that six of the addresses listed are businesses and nine are located in the

beach area. Pl.'s Mot. Summ. J. 3; Pl.'s Facts ¶ 9. Doug Fox identified six addresses in the beach area from the list. Deposition of Doug Fox 3:18–4:22. Herman D. Scurry, a clerk for the United States Postal Service, stated that all of the checked address on the list are located on the beach. Deposition of Herman D. Scurry 4:21–5:18. Kendrick Bryant also stated that two of the locations on the list don't have mailboxes and that seven are businesses. Deposition of Kendrick Bryant 5:3–6:1. Plaintiff asserts: "The only mail at my desk in a flat tub was HOLD MAIL FOR BUSINESS CUSTOMERS WHO REQUEST NO MAIL DELIVERY ON SATURDAYS." Pl.'s Mot. Summ. J. 4. Plaintiff lists twelve businesses with mail on hold July 2, 2005. *Id.*

11. Arguing both that there was no undelivered mail brought back to the post office and that some mail could not be delivered because the mailboxes were blocked is a problem because the

default on this contract," Pl.'s Resp. to Def.'s Facts ¶ 7, and that "all mail was deposited in mailboxes as addressed, when access to the box wasn't obstructed," *id.* at ¶ 9. Plaintiff points out that Postmaster Lee never called her to ask why she returned to the post office with the allegedly undelivered mail and he never issued her a Form 5500.[12] *Id.* at ¶ 14. However, as defendant notes, in plaintiff's response to the Show Cause Notice plaintiff "did not cite any specific example of an obstacle to mail delivery that occurred on July 2, 2005," nor "raise any issue regarding the 25 houses on Ocean Highway that were mentioned in the 'Show Cause Notice.'" Def.'s Facts ¶ 16. Plaintiff offers evidence only that mailboxes along the beach had been blocked during some periods in the past. Deposition of Audrey Smalls 4:4–14. Audrey Smalls, a mail carrier, stated that "on the beach, . . . most of the time the mail box will be blocked." *Id.* at 4:8–10. Ms. Smalls stated that if the box is blocked the mail carriers are supposed to get out of their vehicles and place the mail in the mailbox. *Id.* at 4:17. If this is not corrected, "[Post Master Todd Lee] told us to write on the back of our form that we sign in and out, if the box is blocked a certain amount of time, just put down why you didn't deliver to the people at the mailbox." *Id.* at 4:24–5:3. Ms. Smalls' deposition does not address directly whether, on July 2, 2005, boxes on plaintiff's route were blocked. *See* Deposition of Audrey Smalls *passim.* There remains a genuine issue of material fact as to whether plaintiff delivered all deliverable mail on July 2, 2005. The conflicting sworn statements before the court defeat the possibility of summary judgment. The matter is further complicated by apparent inconsistencies in plaintiff's position.

### III. Plaintiff's Motion to Dismiss Defendant's Counterclaim

With respect to plaintiff's Motion to Dismiss defendant's Counterclaim, unlike plaintiff's Motion for Summary Judgment, the court considers only the pleadings and not factual evidence outside the pleadings. Defendant claims that "as a result of the breach of plaintiff's contract and the Postal Service's subsequent termination of the plaintiff's contract . . . the Postal Service suffered damages in the amount of $1,720.74." Def.'s Answer ¶ 30. Plaintiff moves to dismiss defendant's counterclaim because "[d]efendant failed to disclose to the court the withholding of plaintiff's final pay thus off-setting some if not all of any Reprocurement Cost" and because defendant filed its counterclaim nineteen months after the termination of plaintiff's contract and only after "learning [plaintiff] exercised [her] right in the court of law." Pl.'s Mot. to Dismiss Def.'s Countercl. 2. Defendant argues, as its defense to plaintiff's first argument—of failure to disclose—, that the amount withheld from plaintiff, $414.84, "would not exhaust defendant's counterclaim of $1,720.74." Def.'s Resp. 13. Additionally, "even if the withheld amount exceeded the counterclaim, defendant would not be precluded from seeking a judicial determination under the Contract Disputes Act that the amount of funds withheld for excess reprocurement costs was appropriate." *Id.* Plaintiff cites to no authority that would require defendant to disclose a possibly partial set-off in these circumstances, and the court is aware of no such authority. Accordingly, plaintiff's first argument does not support her motion.

---

factual elements of the two arguments appear inconsistent and leave unanswered questions. For instance, if the only mail in the flat tub was "hold mail," what happened to the mail that could not be delivered because the mailboxes were blocked? By asserting two apparently contradictory arguments, plaintiff decreases the credibility of both.

**12.** A Form 5500 is issued by the Postal Service "[w]hen an HCR contractor fails to adhere to the requirements of its contract, which usually consists of not meeting the delivery schedule or

using broken or unsafe equipment." Def.'s Facts App. 159 (Declaration of Keith L. Harris. Contracting Officer, United States Postal Service) (citation omitted). "The Form 5500 advises the contractor in writing of the nature of the irregularity and offers it an opportunity to reply. Once issued, copies of Form 5500s are maintained in a contractor's file at the local issuing office. The Postal Service uses the Form 5500 to document all service irregularities on HCR contracts." *Id.* at 159–60; *see, e.g.,* Def.'s Facts App. 76–83 (Form 5500s issued to plaintiff).

Plaintiff's second argument for dismissal of defendant's counterclaim is that defendant's counterclaim is made in retaliation for plaintiff's filing of her claim. *See* Pl.'s Mot. to Dismiss Def.'s Countercl. 2. Defendant frames its defense to the second argument as simply a timing issue, specifically, "[w]hether . . . defendant's counterclaim should be dismissed since it was filed 19 months after defendant terminated for default of plaintiff's right to perform under her government contract." Def.'s Resp. 2. Defendant asserts that it has brought its counterclaim within the six-year statute of limitations of the Court of Federal Claims and that plaintiff has failed to allege any facts that support a claim of bad faith by defendant in bringing its counterclaim. *Id.* at 13.

Defendant's counterclaim is a compulsory counterclaim. *See* RCFC 13(a). RCFC 13(a) states:

> The answer shall state as a counterclaim any claim which, at the time of serving the answer, the defendant has against any plaintiff, *if it arises out of the transaction or occurrence* that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. But the answer need not state the claim if at the time the action was commenced the claim was the subject of another pending action.

RCFC 13(a) (emphasis added). Under the rules of this court, defendant was required to state its counterclaim. *See* RCFC 13(a). The result of a failure to state its counterclaim in this proceeding would be that defendant would be barred from asserting it in a later action. *See United States v. Eastport S.S. Corp.*, 255 F.2d 795, 802 (2d Cir.1958) (stating that "the penalty for failure to comply with the [compulsory counterclaim] rule is that an independent action will not subsequently lie upon a claim which should have been asserted as a counterclaim"). The court does not perceive, on the record before it, how defendant's counterclaim could be interpreted as retaliatory where RCFC 13(a) requires it. Furthermore, the issue of whether defendant's counterclaim should be dismissed as time-barred has not been briefed by the parties. The court is not aware of, and the parties have not pointed to, any legal basis for the dismissal of defendant's counterclaim, nor has plaintiff set forth facts that support a dismissal. *See* Pl.'s Mot. to Dismiss Def.'s Countercl. *passim.* The court will therefore not dismiss defendant's counterclaim based on the record before it.

IV. Conclusion

For the foregoing reasons Plaintiff's Motion for Summary Judgment is DENIED. Plaintiff's Motion to Dismiss Defendant's Counterclaim is also DENIED.

The court has before it what appears to be an incomplete contract, *see* Def.'s Facts App. 84–111, 112–52, and conflicting testimony. If the parties are unable to reach a settlement, the court will receive testimony and other evidence on the disputed issues in this case at trial.[13] The court will hold a status conference to clarify the remaining legal and factual issues in this case and to discuss with the parties how best to proceed. The court will contact the parties to schedule the status conference at their early convenience.

IT IS SO ORDERED.

---

**13.** The parties should bear in mind that "[i]n every trial, the testimony of witnesses shall be taken in open court, unless a federal law, these rules, the Federal Rules of Evidence, or other rules adopted by the Supreme Court provide otherwise." RCFC 43(a). Testimony given in a deposition may be presented to the court if the declarant is unavailable as a witness. *See* Fed. R.Evid. 804. The RCFC pertaining to use of depositions in Court Proceedings are set forth in Rule 32. RCFC 32. The RCFC provide for broader use of deposition testimony at the discretion of the court. *See* RCFC 32(a)(3). If a witness is called at trial, his or her prior statements taken in a deposition shall not be introduced, but extrinsic evidence (including deposition testimony) of prior inconsistent statements may be presented if "the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Fed.R.Evid. 613(b); *see* RCFC 32(a)(1).